**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

XTREME CAGED COMBAT, ET AL.,      :
                                       :
               Plaintiffs,   :   CIVIL ACTION
                                       :
   v.                           :   NO. 12-cv-3855
                                       :
ECC FITNESS (AKA EXTREME CAGE   :
COMBAT), ET AL.,                :
                                       :
              Defendants.   :

**<u>MEMORANDUM & ORDER</u>**

JOYNER, J.                         **NOVEMBER 12, 2013**

    Before this Court are Plaintiff's Motion for Summary Judgment (Doc. No. 34) and Reply in Support thereof (Doc. No. 38) which were renewed by Order of this Court (Doc. No. 50). The Court also considers Defendants' Response in Opposition To Plaintiff's Motion (Doc. Nos. 36 and 37).[1] For the reasons outlined below, the Court hereby GRANTS in part and DENIES in part Plaintiff's Motion for Summary Judgment.

---

[1] Plaintiff originally filed a Motion for Summary Judgment prior to the completion of discovery (Doc. No. 34). Defendants argued that the motion was untimely but submitted, in the form of one brief, a Response in Opposition To Plaintiff's Motion for Summary Judgment as well as Defendants' own Motion for Summary Judgment (Docs. No. 36, 37), to which Plaintiff filed a Reply (Doc. No. 38). After the Court denied the cross-motions with leave to re-file pending completion of discovery (Doc. No. 47), Plaintiff moved to renew his Motion for Summary Judgment (Docs. No. 48, 49). The Court gave Defendants 14 days to file a response (Doc. No. 50). Defendants did not file a new response or re-file their previous brief. As a result, the Court will take into account any evidence relevant to the issues at hand submitted by Defendants in Docs. No. 36 and 37, but does not rule upon Defendants' previous Motion for Summary Judgment because it was not timely re-filed.

## II. BACKGROUND

This case involves trademark infringement and other similar claims between two mixed martial arts ("MMA") businesses operating in the Bucks County and Philadelphia areas.

On April 29, 2009, Plaintiff Ryan Kerwin registered the fictitious name "Xtreme Caged Combat" ("XCC") with the Pennsylvania Department of State Corporation Bureau. (Pl. Motion for Summary Judgment at Ex. 1, Doc. No. 34 ("Pl. Ex.")). He described the nature of his business as "mixed martial arts cagefighting." Id. He thereafter adopted a mark for XCC that typically consists of the white and grey capital letters "XCC" above the smaller words, also in capital letters, "Xtreme Caged Combat." (Pl. Ex. 20, 27). The capital letters have a horizontal line cutting through them. Id. The mark is sometimes presented without the acronym, with only the words "Xtreme Caged Combat" appearing against a background of a large "X" of a different font. (Pl. Ex. 41). Plaintiff first used the mark on a flyer promoting an MMA fight on October 3, 2009. (Pl. Reply to Def. Response to Pl. Motion for Summary Judgment at Ex. B, Doc. No. 38 ("Pl. Reply")). On or after this date, the Xtreme Caged Combat business opened at its current location at 11000 Roosevelt Blvd., Philadelphia, PA. (Complaint at ¶ 3, Doc. No. 1). From 2009-2011, XCC promoted at least three fights at the Sportsplex and National

Guard Armory event arenas. (Pl. Ex. 29, 30, 31).[2] At present, XCC continues to promote MMA fights, and uses the XCC/Xtreme Caged Combat mark on its promotional materials. See (Pl. Ex. 23-28, 32-37).

Defendants Steve Rosenblum and Ofa Donaldson met Mr. Kerwin in March 2009, and February 2010, respectively, and became aware of his fight promotion services at those times. (Pl. Ex. 40). Mr. Donaldson was employed at Liberty Boxing, a kickboxing, fitness, and MMA business. (Pl. Ex. 10; Answer at ¶ 14, Doc. No. 18). Plaintiff alleges that Mr. Rosenblum was employed at an MMA business called Liberty MMA. (Complaint at ¶ 14).

At some point during their mutual acquaintance, Mr. Kerwin, Mr. Donaldson, and Mr. Rosenblum entered into negotiations "for the purposes of partnering in the ownership and operation of a mixed martial arts facility named Xtreme Caged Combat located at 50 Hulmeville Road, Penndel, PA 19047." (Pl. Ex. 41). By early November 2011, these negotiations had failed, and the partnership contract for the gym was never signed. (Pl. Ex. 42). Mr. Rosenblum later wrote on Facebook that "Ryan was supposed to be a partnet [sic] with us. However things did not work out as planed [sic]. We chose ECC Fitness instead of Ryans name. We were

---

[2] Plaintiff provides tax sheets for XCC's July 16, 2010, May 20, 2011, and October 22, 2011 events. Plaintiff then argues that "the tax sheets from October 3, 2009, October 1, 2010 and April 1, 2011 are not in plaintiff's possession but could be obtained if needed." (Pl. Motion for Summary Judgment at 3). The Court will not consider these latter three shows because Plaintiff provides no evidence to support that they occurred.

suppose [sic] to open two gyms and ryan was going to be a partner in one." (Pl. Ex. 11).

Between September and December 2011,[3] Mr. Rosenblum and Mr. Donaldson adopted the trade names "ECC Fitness" and "Extreme Cage Combat" for use in their own mixed martial arts gym facility. (Pl. Ex. 68). Defendants refer to their business as "ECC or ECC Fitness." (Answer at ¶ 26). The facility is located at 8801 Torresdale Ave. in Philadelphia, PA, approximately 5-7 miles from XCC's facility. (Complaint at ¶6; Pl. Ex. 55).[4] ECC Fitness offers "fitness classes, group instruction, personal training, self defense classes, plyometrics, medicine ball workouts, kettle bell workouts, stationary bikes, cardio equipment and kids' camps for individuals who are seeking to reach their fitness goals." (Def. Response to Pl. Motion for Summary Judgment at Ex. A ("Def. Ex.")). The business's self-described goal is "to provide a fitness center for those striving for a healthier lifestyle." Id. Mr. Kerwin maintains that Defendants' entry into the fitness market was precipitated by the failed negotiations between the parties. (Pl. Motion at 18-19; Pl. Reply at 8). In addition, though Defendants aver that "ECC Fitness does not have any

---

[3] Whereas XCC states that ECC Fitness began using its mark on November 1, 2011 (Pl. Reply to Def. Motion for Summary Judgment at 4) or in December 2011, (Pl. Motion for Summary Judgment at 19), ECC Fitness replied to an interrogatory that it first adopted the trade names ECC Fitness and Extreme Cage Combat in September 2011. (Pl. Ex. 68).

[4] A Court may take judicial notice of distances based on estimates provided by http://www.mapquest.com. See Coppola v. Ferrallgas, Inc., 250 F.R.D. 195, 199 n.4 (E.D. Pa. 2008).

fighters," (Pl. Ex. 68), ECC Fitness has sponsored boxing matches
(Pl. Ex. 45, 46, 67), promoted those matches on the internet, id.,
are affiliated with at least two boxers (Pl. Ex. 8, 9, 44, 89),
employ an MMA fighter (Pl. Ex. 66), and have advertised their sale
of "MMA tickets" to an event called "Locked in the Cage." (Pl. Ex.
9; see also Pl. Ex. 65).

The mark that Defendants adopted for ECC Fitness typically
contains an image of a fist holding an octagonal sign stating
"Boxing and MMA" beneath the words "ECC Fitness." (Pl. Ex. 12,
65). The mark has jagged, lightning-like lines emanating from the
words. Id. The word "Fitness" is the largest word in the mark, and
the letters are usually black and set off by a white outline. Id.
There is a horizontal line cutting through the capital letters of
the mark. Id. At times, however, Defendants' mark is presented
without the word "Fitness" or the octagonal sign. (Pl. Ex. 3, 45,
65). Moreover, Defendants have referred to themselves simply as
"ECC" on Facebook. (Pl. Ex. 46). After adopting their mark, Mr.
Donaldson and Mr. Rosenblum began to advertise ECC Fitness through
pamphlet mailings, Facebook and other internet postings, T-shirts,
and advertisements on grocery carts. See, e.g., (Pl. Ex. 4, 45,
46, 8, 9). These advertisements targeted individuals in the same
geographic area in which XCC conducts most of its advertising,
(Pl. Motion at 15-16; Def. Response In Opposition to Pl. Motion
for Summary Judgment at 13 ("Def. Response")).

Mr. Kerwin avers that he warned Mr. Rosenblum and Mr. Donaldson multiple times to refrain from promoting their business under the name Extreme Cage Combat, but that these warnings were ignored. (Complaint at ¶20).

On June 4, 2012, Mr. Kerwin opened Xtreme Caged Combat's general fitness and gym facilities. (Pl. Motion for Summary Judgment at 19-20 ("Pl. Motion")). At present, XCC is a gym that offers training in the disciplines of MMA, boxing, jiujitsu, muay thai, and wrestling, as well as general fitness facilities. (Pl. Motion at 7). Less than 10% of XCC's members compete in any discipline of combat sports, while the remaining 90% of its members use XCC only as a place to learn self-defense and stay in shape. Id. Mr. Kerwin currently advertises XCC's fight promotion and training facilities through the use of flyers, and Facebook and other internet postings, all bearing the XCC/Xtreme Caged Combat mark. See, e.g., (Pl. Ex. 5, 20-22).

In 2012 and 2013, Plaintiff received multiple pieces of communication from individuals or businesses who had mistakenly contacted him when they meant to contact the Defendants. One MMA fighter stated he had defeated an XCC fighter in a recent fight, when in fact he had defeated an ECC Fitness fighter.[5] (Pl. Motion

---

[5] The Court may consider evidence that, if presented in appropriate form, would be admissible at trial. ERBE Electromedizin GmbH v. Canady Technology LLC, 529 F.Supp.2d 577, 587 (W.D. Pa. 2007)(citing J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3rd Cir. 1990)). Though Plaintiff's description of the substance of a conversation between Plaintiff and a member of the boxing community is currently presented as inadmissible hearsay, it may be possible at trial to present this content in an admissible

at 15). Two current or former clients of ECC Fitness contacted Plaintiff because they believed their credit cards had been overcharged by XCC, when in fact they had been charged by ECC Fitness. (Pl. Motion at 15; Pl. Ex. 50, 51). Two vendors with whom Plaintiff conducts business, Tents and Events and Primal Nutrition, also contacted Plaintiff about transactions with ECC Fitness, not XCC. (Pl. Motion at 15; Pl. Ex. 47, 48, 49).

Mr. Kerwin brought his claim alleging trademark infringement, *pro se*, in July 2012. Defendants thereafter brought counterclaims for trademark infringement, false designation/false description, unfair competition, and defamation. At the time that they filed their Response in Opposition To Plaintiff's Motion, Defendants were represented by counsel. They now proceed *pro se* as well.

## III. STANDARD OF REVIEW

Upon considering a motion for summary judgment, the Court shall grant the motion "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making this determination, "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(alteration in original)(internal quotation marks omitted). "There is no issue

_____

form.

for trial unless there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The
party opposing summary judgment "may not rest upon the mere
allegations or denials of the . . . pleading; its response, by
affidavits or as otherwise provided in this rule, must set forth
specific facts showing that there is a genuine issue for trial."
Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir.
2001)(alteration in original)(internal quotation marks omitted).
If the Court does not grant or deny a summary judgment motion in
full, "it may enter an order stating any material fact . . . that
is not genuinely in dispute and treating the fact as established
in the case." Fed. R. Civ. P. 56(g).

**IV. DISCUSSION**

To establish trademark infringement in violation of the
Lanham Act, 15 U.S.C. § 1114, a plaintiff must prove that (1) the
mark is valid and legally protectable, (2) the plaintiff owns the
mark, and (3) the defendant's use of the mark is likely to create
confusion concerning the origin of goods or services. E.T. Browne
Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 191 (3d Cir.
2008). Whether or not a mark is valid and legally protectable
depends on its category. The categories are as follows:

> [1] arbitrary (or fanciful) terms, which bear
> no logical or suggestive relation to the

> actual characteristics of the goods; [2]
> suggestive terms, which suggest rather than
> describe the characteristics of the goods;[3]
> descriptive terms, which describe a
> characteristic or ingredient of the article to
> which it refers; and [4] generic terms, which
> function as the common descriptive name of a
> product class.

Id. (citing A.J. Canfield Co. v. Honickman, 808 F.2d 291, 296 (3d

Cir. 1986)). Arbitrary and suggestive terms are automatically

protected under the Lanham Act; descriptive terms are protected if

they have "acquired a secondary meaning associating the term with

the claimant"; and generic terms are accorded no protection. Id.

Because Xtreme Caged Combat's trademark is not registered with the

U.S. Patent and Trademark Office ("USPTO"), it bears the burden of

proving the existence of a protectable mark. XCC contends that

"Extreme Caged Combat" is suggestive, or, in the alternative,

descriptive. Whether "Extreme Caged Combat" is suggestive,

descriptive, or generic, is a question of fact. Id. at 192

(internal citations omitted).

## A.   IS THE MARK VALID AND LEGALLY PROTECTABLE?

In its review of the pleadings, arguments, and admissible

evidence presented by the parties, the Court has concluded that

there exists a genuine dispute of material fact as to whether the

mark is suggestive, descriptive, or generic, and, if descriptive,

whether it has acquired a secondary meaning. Summary judgment is

thus denied on whether the Xtreme Caged Combat mark is valid and

legally protectable.

### 1.    Is "Xtreme Caged Combat" Suggestive?

Under the Lanham Act, suggestive terms are automatically valid and legally protectable. A suggestive mark "suggests rather than describes the product or source of the goods by conveying indirect or vague information about the product or service." Zurco, Inc. v. Sloan Valve Co., 785 F.Supp.2d 476, 490 (W.D. Pa. 2011)(internal quotations omitted). The difference between suggestive and descriptive marks is often "distinguished 'on an intuitive basis rather than as the result of a logical analysis susceptible of articulation.'" Id. (quoting Dranoff-Perlstein Associates v. Sklar, 967 F.2d 852, 854-55 (3d Cir. 1992)). The commercial impression of a mark must be evaluated in its entirety. In re Oppedahl & Larson LLP, 373 F.3d 1171, 1174, 1177 (Fed. Cir. 2004). If various portions of a mark are individually merely descriptive, the combination of the individual parts must also be considered to see whether the whole "conveys any distinctive source-identifying impression contrary to the descriptiveness of the individual parts." Id. at 1175 (internal citations omitted).

Third Circuit courts apply the "imagination test" in determining whether a term is suggestive. Zurco, Inc., 785 F.Supp. at 490 (classic examples of suggestive marks include "Coppertone" for suntan oil and "Sheer Elegance" for pantyhose, while descriptive marks include "Vision Center" for optical services and

10

"Investacorp" for an investment company). Under the test, if
information about the product or service given by the designation
is indirect or vague and requires imagination and thought to get
information about the product or service, then the term is being
used in a suggestive, not descriptive, manner. 2 McCarthy on
Trademarks and Unfair Competition § 11:19 (4th Ed.).

XCC argues that "Xtreme Caged Combat" is suggestive and not
merely descriptive. XCC offers, in the form of an affidavit signed
by XCC owner Ryan Kerwin, that "Xtreme Caged Combat" is not merely
a direct description of the services that his business offers:
indeed, a large majority of XCC members utilize XCC's general
"mixed martial arts type services" (Pl. Reply at 11) not because
they intend on competing in mixed martial arts fights. Instead,
they are "interested in self defense and getting in shape 'only.'"
(Pl. Motion at 7). Of the members that do compete or aspire to do
so, some intend to compete in a single non-caged discipline such
as wrestling, muay thai, boxing, or jiujitsu, and not in the
fusion combat sport known as MMA. Id. Moreover, those training to
compete in MMA do not fight in a cage at Plaintiff's gym. Id.

The Court finds that there exists a genuine dispute of
material fact as to whether Plaintiff's mark is suggestive. The
fact that Plaintiff's mark does not encompass all of the
activities provided at his training facility does not mean his
mark is suggestive. A mark may be merely descriptive even if it

11

does not describe the "full scope and extent of the applicant's goods or services." In re Oppedahl & Larson LLP, 373 F.3d 1171, 1173 (Fed. Cir. 2004)(internal citation omitted). In fact, Defendants have presented persuasive evidence that the words "Xtreme Caged Combat" give direct, concrete information about some of Plaintiff's main services that does not require the aid of imagination or thought. Defendants provide dictionary definitions of "cage fighting" ("a form of extreme fighting") and "extreme" ("utmost or exceedingly great in degree")(Def. Ex. D1, D2), both of which suggest that Plaintiff's mark directly describes the activities related to Plaintiff's business. Moreover, disclaimers that have been required of trademark applicants by the USPTO strongly suggest that Plaintiff's mark cannot be considered suggestive. While one disclaimer requires that the applicant for the trade name "BATTLE CAGE XTREME" disclaim "the descriptive wording "EXTREME" . . . because it merely describes the fact that the services are in the field of an extreme sport, which are sports that involve a high risk of danger or physical activity," (Def. Ex. A2), another requires "WARRIOR EXTREME CAGEFIGHTING" to disclaim "the descriptive wording "EXTREME CAGE FIGHTING" . . . because it merely describes a feature or subject matter of the services." (Def. Ex. A3). The USPTO goes on to explain that a disclaimer is required because an applicant cannot "claim

exclusive rights to an unregistrable component of a mark."[6] Based on this evidence, a juror could conclude that Plaintiff's "Xtreme Caged Combat" mark is not a suggestive mark.

## 2.    Is "Xtreme Caged Combat" Generic?

Moving next to the opposite end of the distinctiveness spectrum, the Court finds that there exists a genuine issue of material fact as to whether the mark "Xtreme Caged Combat" is generic. Generic terms are not valid and legally protectable under the Lanham Act. A generic term "is essentially the common name for an article." Zurco, Inc. v. Sloan Valve Co., 785 F.Supp.2d at 488 (internal citations omitted). The Third Circuit has held that "[t]he jurisprudence of genericness revolves around the primary significance test, which inquires whether the primary significance of a term in the minds of the consuming public is the product or the producer." A.J. Cantfield Co. v. Honickman, 808 F.2d 291, 292-93 (3d Cir. 1986); see also Berner Intern. v. MarsSales Co., 987 F.2d 975, 980 (3d Cir. 1993). The term is generic if it refers to the product, while it is not generic if it refers to the source or producer of that product. E.T. Browne Drug Co. v. Cococare Products, Inc., 538 F.3d 185, 192 (3d Cir. 2008)("'Cola' is generic because it refers to a product, whereas 'Pepsi Cola' is

---

[6] The USPTO's determination that a term is "merely descriptive" is directly relevant to the Court's analysis under the Lanham Act. See, e.g., Coach Services, Inc. v. Triumph Learning LLC, 668 F.3d 1356, 1377-78 (Fed. Cir. 2012)(reviewing Board's descriptiveness finding). A mark that "is merely descriptive or deceptively misdescriptive of" goods is not registrable by the USPTO on the Principal Register. 15 U.S.C. § 1052(e).

not generic because it refers to the producer.")[7] Marks that have
been found to be generic in this Circuit include "NETBANK,"
interState Net Bank v. NetB@nk, Inc., 221 F.Supp.2d 513, 527 (D.
N.J 2002); "FINANCIAL SYSTEMS SOFTWARE," 85 F.Supp.2d 482, 488
(E.D. Pa. 1999); and "diet chocolate fudge soda," 808 F.2d 291,
292 (3rd Cir. 1986).

The focus of this test is necessarily on the consumers of the
product or service offered under the mark, and "should be
evaluated by examining its meaning relevant to the consuming
public." 538 F.3d at 194. Applying the primary significance test
here, the relevant inquiry is whether consumers or members of
mixed martial arts businesses understand the phrase "Xtreme Caged
Combat" to refer specifically to Plaintiff's business branded with
that mark, or generically to any training facility that offers
mixed martial arts training. The sources that can be used to
answer that question are numerous, and may include purchaser
testimony, consumer surveys, listings in dictionaries, trade
journals, newspapers, and other publications. Berner Intern. Corp.
v. Mars Sales Co., 987 F.2d at 982; interState Net Bank, 221
F.Supp. 2d at 524-25. Generally, direct consumer evidence such as

---

[7] In E.T. Browne Drug Co. v. Cococare Products, the Third Circuit
clarified that the primary significance test should typically control a
district court's analysis. 538 F.3d at 192-94. Only if it is unclear if a
manufacturer has created a new product – which is not the case here – should
the district court apply the alternate test set forth in A.J. Cantfield Co. v.
Honickman. In the present case, the relevant product is "fight promotion and
training facilities" or "facilities that offer MMA training and promote
fights."

consumer surveys is preferable to indirect forms of evidence. 987 F.2d at 982.

The Court has before it no direct - and very little indirect - evidence of consumer[8] understanding of the term "Xtreme Caged Combat." XCC makes only a conclusory statement that "the XCC mark is clearly interpreted by the consuming public to be a representation of the origin of a specific brand of mixed martial arts products and services," and points to advertisements bearing the XCC logo as support. (Pl. Motion at 8). However, these marketing materials were created by the Plaintiff in an effort to imprint his mark in the public's mind, and reveal nothing about his success in doing so. Evidence of the Plaintiff's perceptions about or efforts to create his own mark are irrelevant for the genericness inquiry. See, e.g., Zurco, Inc., 785 F.Supp.2d at 489 ("the manner in which [defendants'] executives understand the term is legally irrelevant to the ultimate determination as to what the term means to the consuming public.").

There exists sufficient evidence for a juror to find that "Xtreme Caged Combat" is generic. Dictionary definitions provided by Defendants for the terms "fight" ("battle or combat"), and

---

[8] XCC does not explicitly address who it perceives the relevant consuming public to be. While it states that the majority of its members are interested in pursuing fitness or self-defense goals (Pl. Motion at 7), its marketing materials are also fight promotion-focused. See, e.g., (Pl. Ex. 27, 28, 32, 33). For the purposes of this motion, the Court will assume that the relevant consuming public consists both of individuals interested in watching or participating in MMA fights and those interested in furthering fitness or self-defense goals by training at a facility that is associated with MMA, jiujitsu, boxing, and other similar disciplines.

"cage fighting" ("a form of extreme fighting taking place in an enclosed space"),(Def. Ex. D1, D2), show that the words in Plaintiff's mark are closely associated with the activities promoted by or trained for at Plaintiff's business. A juror would be reasonable in finding that "Xtreme Caged Combat" is a common term for MMA fighting or even training. Thus, a genuine issue of material fact exists as to whether "Xtreme Caged Combat" is generic.

### 3.   Assuming "Xtreme Caged Combat" is Descriptive, Has it Acquired Secondary Meaning?

The Court will next address whether, if Plaintiff's mark is found to be descriptive, it is valid and legally protectable. Marks that are merely descriptive are only valid and legally protectable if they have acquired a "secondary meaning." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 769 (1992). Secondary meaning is acquired if the mark "has become distinctive of the applicant's goods [or services] in commerce," id.(internal citations omitted), and is generally established through "extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." Commerce Nat. Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3rd Cir. 2000). Whether or not a designation has acquired a secondary meaning is a question of fact. McCarthy on Trademarks and Unfair Competition § 15:29 (4th ed.).

16

Notably, there exists some disagreement regarding the date on which ECC Fitness first began using its mark. To prevail, XCC must prove that it had achieved secondary meaning by "the time and place that Defendants began use of the mark." Fagnelli Plumbing Co., Inc. v. Gillece Plumbing and Heating, Inc., 2011 WL 693349 at *7 (W.D. Pa. 2011). Whereas XCC states, without evidentiary support, that ECC Fitness began using its mark on November 1, 2011 (Pl. Reply at 4), ECC Fitness replied to an interrogatory that it first adopted the trade names ECC Fitness and Extreme Cage Combat in September 2011. (Pl. Ex. 68). The Court finds this to be a genuine issue of material fact for resolution by a jury.

The Third Circuit has identified eleven non-exclusive factors relevant to determining secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) the length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers, and (11) actual confusion.

Commerce Nat. Ins. Services, Inc., 214 F.3d at 438. Plaintiff presents evidence regarding six of the eleven factors.

The following facts support a secondary meaning finding: Plaintiff has used its mark since October 3, 2009 (Pl. Reply at Ex. B), or roughly two years prior to Defendants' first use of its mark, cf AcademyOne, Inc. v. CollegeSource, Inc., 2009 WL 5184491

17

at *11 (E.D. Pa. 2009)(finding no support for reasonable inference of secondary meaning when mark used exclusively for only 7 months); before 2011, at least 1,766 people had attended the fights it promoted;[9] Plaintiff is the only MMA gym to use the mark "Xtreme Caged Combat" in the Philadelphia and Bucks County areas and was the only entity to employ the term "Xtreme" when Plaintiff first began using the mark (Pl. Ex. 39; Pl. Reply at 4-5, Ex. D, E); and Plaintiff has provided some evidence of actual confusion among businesses with which Plaintiff has worked in the past.[10]

The following facts, however, do not weigh in favor of a finding that Plaintiff's mark has achieved a secondary meaning: one entity, X-treme Mixed Martial Arts, currently uses a name similar to Plaintiff's while another entity, Team Boxing, offers an activity called "Battle Cage Xtreme" (Def. Ex. B2; Pl. Ex. 39);[11] while Plaintiff provides some evidence of ticket sales to

---

[9] The extent of advertising, number of sales, and number of customers is only material up to the date when ECC Fitness first began using its mark. See Commerce Nat. Ins. Services, Inc., 214 F.3d at 440; see also McCarthy on Trademarks and Unfair Competition § 15:4 (4th ed.). Plaintiff provides tax sheets for XCC's July 16, 2010, May 20, 2011, and October 22, 2011 events, which total 1,766 tickets sold. (Pl. Ex. 29, 30, 31). Plaintiff then argues that "the tax sheets from October 3, 2009, October 1, 2010 and April 1, 2011 are not in plaintiff's possession but could be obtained if needed." (Pl. Motion for Summary Judgment at 3). As noted above, the Court cannot consider these latter three shows.

[10] The Court provides a full discussion of actual confusion in Section C(4) below.

[11] Plaintiff argues that "[n]either of these business' [sic] are relevant [sic] to the argument at hand particularly when you consider these were mma promotions and not gyms." (Pl. Reply at 5). However, Plaintiff relies on ticket sales to MMA fights promoted by XCC to support his secondary meaning argument. (Pl. Motion at 8-9). The Court finds MMA promotion to be absolutely relevant to XCC's business.

fights promoted by XCC, it provides no evidence of XCC's profits, or the number of members of its business over time; and the record is wholly devoid of any relevant customer survey data or trade journal entries.

Based on the foregoing, the Court concludes that there exist genuine issues of material fact for resolution by a jury regarding any secondary meaning acquired by Plaintiff's mark. A jury could find that the evidence presented by Plaintiff - exclusive use for a period of time, ticket sales to three shows, and evidence of actual confusion - is insufficient to prove that secondary meaning was established. In Commerce Nat. Ins. Services, the Third Circuit concluded that a Bank's exclusive use of the "Commerce" name in the New Jersey area with respect to banking and the size of the Bank was insufficient to support a finding of secondary meaning. 214 F.3d at 440. In E.T. Browne Drug Co., the Third Circuit held that use and promotion of a term for twenty years, substantial amounts of money spent promoting the term, and increase in sales products bearing the term was also insufficient, explaining that "[a]lthough the evidence leaves no doubt that [plaintiff] hoped the term would acquire secondary meaning, nothing shows that it achieved this goal." 538 F.3d at 199. In the case at hand, a juror could find under E.T. Browne Drug Co. that Plaintiff had attempted, but failed to, create secondary meaning of his mark. Moreover, there exist disputed issues regarding the date on which

19

Defendants began using their mark and the volume of relevant sales by Plaintiff, facts material to the secondary meaning analysis. Thus, the Court denies summary judgment to Plaintiff on whether the mark "Xtreme Caged Combat" has acquired secondary meaning.

**B.  PLAINTIFF'S OWNERSHIP OF THE MARK**

The second element necessary to establish a Lanham Act violation is ownership of the mark. E.T. Browne Drug Co., 538 F.3d at 191. A party establishes ownership of an unregistered mark by being the first to adopt the mark and continuously use it in commerce; a party does not establish ownership by being the first to register the mark. Gemmer v. Surrey Services for Seniors, Inc., 2010 WL 5129241 at *14 (E.D. Pa. 2010)(citing Hydro-Dynamics, Inc. v. George Putnam & Co., Inc., 811 F.2d 1470, 1473 (Fed. Cir. 1987)); Barrolle v. Liberian Sports Ass'n of Pennsylvania, 2011 WL 3047811 at *4 (E.D. Pa. 2011)(citing Ford Motor Co. v. Summer Motor Prods., Inc., 930 F.2d 277, 291 (3d Cir. 1991)). Mr. Kerwin asserts that he owns the mark in both the MMA fight promotion and general fitness markets.[12]

The Court finds that, while XCC was first to use the mark in commerce with regard to fight promotion activities, a jury would be reasonable in finding that the use may not have been continuous during the period before Defendants adopted the ECC Fitness mark.

---

[12] Contrary to Plaintiff's assertion that Defendants have explicitly admitted that Mr. Kerwin is the owner of the mark, Defendants have only admitted that Ryan Kerwin is the owner of Xtreme Caged Combat, the business with this name, not the mark itself. (Def. Answer at 2).

Plaintiff adopted the "Xtreme Caged Combat" mark by including it on a promotional flyer advertising an MMA fight on October 3, 2009. (Pl. Reply at Ex. B). Though Plaintiff also submits Promoter's Ticket Accounts for events promoted on July 16, 2010 (Pl. Ex. 29), October 22, 2011 (Pl. Ex. 31), and May 20, 2011 (Pl. Ex. 30), these tax sheets do not mention the names Ryan Kerwin, XCC, or Xtreme Caged Combat. Though these events may well have been promoted using the XCC/Xtreme Caged Combat mark, the Court cannot conclude that they were because Plaintiff has not provided the Court with the promotional flyers corresponding to these tax sheets.[13] As a result, a jury could find that Plaintiff's use of the mark between October 3, 2009 and Defendants' first use of their mark may not have been continuous. The Court cannot grant summary judgment to XCC on the issue of its ownership of the mark, "Xtreme Caged Combat," with regards to its MMA fight promotion activities.

In addition, Plaintiff has not proven ownership of the mark as to the general fitness market. When a senior user of a mark expands into a second service industry, and finds an intervening junior user of the mark, ownership in the second industry is determined by whether the expansion is "natural" in the eyes of

---

[13] Plaintiff does provide the Court with multiple XCC flyers. However, many of these are undated, and thus shed no light on the continuity of use during the relevant time period. See, e.g., (Pl. Ex. 5, 20, 22). The flyers whose dates match the tax sheets submitted by Plaintiff all prove that XCC hosted shows in 2012 and 2013, see, e.g., (Pl. Ex. 23-28, 32-37) but again shed no light on continuity of use of the mark from 2009-2011.

consumers. See Commerce Nat. Ins. Services, Inc., 214 F.3d at 441-442; see also McCarthy on Trademarks § 16:5, § 24:20 (4th ed.).

The affidavit of Defendant Steve Rosenblum states that Plaintiff offered no fitness services prior to ECC Fitness's use of its mark, and Plaintiff admits that he first began offering general fitness services on June 4, 2012 (Pl. Motion at 19-20). Plaintiff does not show that XCC's expansion from the MMA fight promotion business to the general fitness industry was "natural" in the eyes of consumers in 2011. Though Plaintiff argues that Defendants knew that Plaintiff intended to expand into this industry, "mere invention, creation, or discussion of a trademark does not create priority rights." Hydro-Dynamics, Inc. v. George Putnam & Co., Inc., 811 F.2d at 1473. Moreover, such evidence does not aid in a determination of what *consumers* expected of XCC at the time. A jury could certainly find that Plaintiff does not own its mark with respect to the general fitness industry.

In sum, the Court denies summary judgment to Plaintiff on his ownership of the mark "Xtreme Caged Combat" as to both MMA fight promotion services and in relation to general fitness services.

## C.   IS THE DEFENDANT'S USE OF THE MARK LIKELY TO CREATE CONFUSION REGARDING THE ORIGIN OF THE GOODS OR SERVICES?

To satisfy the third element of trademark infringement under the Lanham Act, "plaintiff[] must show that consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service

22

identified by a similar mark." Sabinsa Corp. v. Creative Compounds, LLC, 609 F.3d 175, 182 (3d Cir. 2010)(citing Checkpoint Sys., Inc. v. Check Point Software Techs., Inc., 269 F.3d 270, 279 (3d Cir. 2001)). The Third Circuit has set forth the following factors to aid in this determination:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of similarity of functions; and (10) other factors suggesting the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

Id. (citing Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983)). The Lapp factors must be weighed and balanced against one another, with no one factor being determinative. Id. at 182-3. However, the similarity of the marks is the single most important factor. Id.

### 1.   Similarity of the Marks [Lapp Factor 1]

"Marks are confusingly similar if ordinary consumers would

likely conclude that [the two products] share a common source, affiliation, connection or sponsorship." <u>Sabinsa Corp. v. Creative Compounds, LLC</u>, 609 F.3d at 183 (quoting <u>Fisons Horticulture, Inc. v. Vigoro Indus., Inc.</u>, 30 F.3d 466, 477 (3d Cir 1994)). Instead of doing a side-by-side comparison of the marks, the overall impression of each mark, including its sight, sound, and meaning, should be considered. <u>Id</u>. If the competing goods or services are directly competitive, the degree of similarity required to prove likelihood of confusion is less than if the products are dissimilar. Id. (quoting Kos Pharmaceuticals v. Andrx Corporation, 369 F.3d 700, 713 (3d Cir. 2004)).

This first - and most important - factor weighs slightly in Plaintiff's favor. Plaintiff's mark typically consists of the large, white and grey capital letters "XCC" above smaller capital letters spelling "XTREME CAGED COMBAT," presented on a black or dark background (Pl. Ex. 20, 27). The XCC mark is sometimes presented without the acronym, with only the words "Xtreme Caged Combat" appearing against a background of a large "X" of a different font. (Pl. Ex. 41). Though Plaintiff's website displays lightning-like jagged lines (Def. Ex. C), these lines are not present on any other marketing materials. (Pl. Ex. 21, 22). The overall impression given by Plaintiff's mark is dark and focused on the "caged combat" aspects of Plaintiff's services.

Defendants' mark typically contains the image of a fist

holding an octagonal sign stating "Boxing and MMA" beneath the words "ECC Fitness" and employs jagged, lightning-like lines emanating from the words to the edges of the mark. (Pl. Motion at Ex. 12, 65). The word "Fitness" is the largest word in the mark. The letters are black and set off by a white outline, and the font is different than Plaintiff's. The overall impression given by Defendants' mark is that of a fist punching through a wall to create cracks, with the word "Fitness" heavily emphasized.

Looked at as a whole, both marks use an all-capital, three-letter acronym ending with the same two letters, and both have a horizontal line cutting through the capital letters. The similarities in sound and meaning are lessened due to the word "Fitness," (Pl. Ex. 4, 12, 13) which places an emphasis on general exercise and health, as opposed to the combat-focused mark of XCC.

The Court notes, however, that Defendants' mark has in some public fora been presented without the main differentiating word "Fitness" (Pl. Ex. 3, 45, 65) or the octagonal sign held by a fist. On at least one website, Defendants have used the mark "ECC Fitness MMA & Boxing Gym" (Pl. Ex. 62) without the fist, and have on Facebook referred to themselves simply as "ECC" (Pl. Ex. 46), which is extremely close in aesthetic appearance, sound, and meaning to XCC. See, e.g., Sabinsa Corp., 609 F.3d at 184 (finding "Forslean" and "Forsthin" marks to be visually and connotatively similar). Defendants readily admit that "ECC refers to itself as

25

ECC or ECC Fitness." (Answer at ¶ 26). Additionally, Defendants'
checks used to pay vendors refer to their business as "Extreme
Cage Combat MMA and Boxing LLC" (Pl. Ex. 49), without any
reference to "ECC Fitness." Lastly and most similar to Plaintiffs'
mark is the use of Defendants' mark on a T-shirt and gym shorts
that, according to Plaintiff, was worn by fighter Ed Shupe at a
June 16, 2012 event. While the shorts bear the term "ECC Fitness,"
it appears to the Court[14] that the T-Shirt says "Extreme Cage
Combat" in large letters, without any mention of the word
"Fitness." (Pl. Ex. 64).

Defendants have too often used a version of their mark that
is highly similar to Plaintiff's for the Court to find that the
marks are distinct. Were the Defendants to always employ the mark
with the fist and octagonal sign, the overall impression created
by the marks would be distinct due in large part to the bold,
differentiating word "Fitness." See A&H Sportswear, Inc. v.
Victoria's Secret Stores, Inc., 237 F.3d 198, 216 (3d Cir.
2000)("the more forceful and distinctive aspects of a mark should
be given more weight, and the other aspects less weight").
However, because Defendants refer to themselves as ECC, post on
Facebook as ECC, and print T-shirts with the words "Extreme Cage
Combat," the Court finds this factor to weigh just in Plaintiff's
favor.

---

[14] The image on the T-shirt is partly obscured by the arm of the
individual wearing the T-shirt. Moreover, the image is not fully in focus.

**2. Strength of Mark [<u>Lapp</u> Factor 2]**

Because Plaintiff has not addressed this factor, the Court will touch upon it only briefly. Courts determine the strength of a mark by looking at its (1) inherent features contributing to its distinctiveness or conceptual strength, and (2) the factual evidence of the mark's commercial strength or of marketplace recognition of the mark. <u>Sabinsa Corp.</u>, 609 F.3d at 184-85. As discussed above, Plaintiff "Xtreme Caged Combat" is not necessarily a strong suggestive mark. Moreover, the fact that Plaintiff uses somewhat different versions of the mark weakens its strength. The Plaintiff has offered no evidence regarding any marketplace recognition of the mark. This factor weighs toward Defendants.

**3.   Purchasers' Care and Sophistication [<u>Lapp</u> Factor 3]**

The Court notes that there is no evidence that attendees of MMA or boxing matches, or members of Plaintiff's or Defendant's gyms, are highly sophisticated. "Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." <u>Sabinsa Corp.</u>, 609 F.3d at 186 (internal citations omitted). Because the appropriate standard of care is "equal to that of the least sophisticated consumer in class," <u>id</u>., this factor weighs in favor of XCC.

4.    **Length of Time Without Confusion / Evidence of Actual Confusion [Lapp Factors 4 and 6]**

This factor weighs somewhat in Plaintiff's favor. Though evidence of actual confusion is not necessary, it "is nevertheless highly probative of a likelihood of confusion." Sabinsa Corp., 609 F.3d at 187. Evidence of confusion is relevant not only where the confusion is among actual or potential customers. See, e.g., Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 711 (3rd Cir. 2004)("The Act is now broad enough to cover the use of trademarks which are likely to cause confusion, mistake or deception *of any kind*, not merely of purchasers . . . .)(emphasis in original); Koppers Co. Inc. v. Krupp-Koppers GmbH, 517 F.Supp. 836, 843 (W.D. Pa. 1981)(describing "congressional intent that the persons should not be restricted to purchasers . . . this Court infers that it must broadly define the nature of the forbidden confusion and the class of people whose confusion is forbidden."); see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group, 376 F.3d 8, 17 (1st Cir. 2004)(finding confusion among non-purchasing third parties to be commercially relevant); 4 McCarthy on Trademarks and Unfair Competition § 23:5 (4th ed.). For example, the confusion of third parties may be relevant if their views are related to the goodwill of the aggrieved manufacturer. Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1216 n. 10 (9th Cir. 2012)(gathering cases).

Plaintiff offers multiple pieces of evidence of actual confusion in 2012-2013. With regard to his fight promotion

services, Plaintiff describes a conversation in which an MMA
fighter revealed that he believed he had defeated an XCC member in
a recent fight, whereas he had actually defeated an ECC Fitness
member. (Pl. Motion at 15). Plaintiff also offers a 2013 email
exchange with Tents and Events, a company with whom Plaintiff
regularly conducts business, evidencing confusion about a bounced
check that in fact originated with Defendants, not Plaintiff. (Pl.
Ex. 47, 48, 49). In addition, Plaintiff received a phone call from
a vendor, Primal Nutrition, because the vendor mistook a voicemail
left for him to be from Plaintiff, when in reality it had been
left by the Defendants. (Pl. Motion at 13). Although the confusion
did not weaken Plaintiff's relationship with these vendors or the
fighter, the Court nonetheless finds that Plaintiff's evidence is
commercially relevant, and shows a nascent degree of actual
confusion regarding Plaintiff's fight promotion services.

Plaintiff also puts forth an email exchange between Mr.
Kerwin and a former customer of ECC Fitness, in which the former
customer is mistaken about whether the charges on her credit card
were charged by Plaintiff or Defendants' company, (Pl. Ex. 50,
51), and evidence of a similar mistake by a different customer of
Defendants. (Pl. Motion at 15). Both of the customers believed
that they had been unjustly overcharged. Although neither customer
was lured away from Plaintiff's services by the similarity of
Defendant's mark - the main type of mistake sought to be remedied

by the Lanham Act - these customers' negative perceptions of Xtreme Caged Combat could affect the goodwill of the XCC mark generally. Plaintiff's evidence is probative of a likelihood of confusion to a moderate extent.

> **5.  The Intent of the Defendants in Adopting the Mark [Lapp Factor 5]**

The Court finds this factor to weigh toward Plaintiff. The inquiry is "whether the defendant chose the mark to intentionally confuse customers, and thereby capitalize on the senior user's goodwill, and whether the defendant gave adequate care to investigating its proposed mark." Sabinsa Corp., 609 F.3d at 187 (internal citation omitted). Like actual confusion, evidence under this factor is not requisite, yet "weighs heavily in favor of finding a likelihood of confusion." Id. Plaintiff has provided evidence that the owner of XCC, Ryan Kerwin, and the owners of ECC Fitness, Ofa Donaldson and Steve Rosenblum, intended to enter into a 2011 contract in which each would share equally in the profits of Xtreme Caged Combat, with Mr. Kerwin remaining as the owner of the facility. (Pl. Ex. 41, 42). The proposed contract was never signed, but Mr. Rosenblum and Mr. Donaldson opened their MMA fitness facility shortly thereafter. Though not conclusive evidence of Defendants' intent, the fact that Defendants adopted as part of their name an acronym that stands for "Extreme Caged Combat" shortly after they failed to gain an interest in Mr. Kerwin's Xtreme Caged Combat business could reasonably indicate

intent to capitalize on Xtreme Caged Combat's goodwill. Moreover, Defendants' sometimes use of the words "Extreme Caged Combat" as their mark, without the differentiating word "Fitness," suggests the same conclusion. That there are many entities that use terms similar to "Xtreme Caged Combat" is not probative on the issue of Defendants' intent in adopting their own mark. The Court finds this factor to weigh in favor of Plaintiff.

**6.   Whether the Goods are Marketed Through the Same Channels of Trade / Extent to Which Targets of the Parties' Sales Efforts are the Same [Lapp Factors 7 and 8]**

This factor also favors Plaintiff. "[W]hen parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion." Checkpoint Systems, Inc., 269 F.3d at 289. In analyzing this factor, the Court should look to "trade exhibitions, publications, and other media the parties use in marketing their products." Sabinsa Corp., 609 F.3d at 188.

The geographical distances between Plaintiff's and Defendants' facilities are minimal, (Pl. Ex. 55), and both parties use the same type of pamphlets and advertisements in that geographic region. The Court's review of both parties' advertisements bears out that there is great similarity in their advertising and marketing campaigns, which target both gymgoers and those interested in boxing or MMA fights. Compare (Pl. Ex. 5, 12, 20, 21, 62) with (Pl. Ex. 4, 6, 12, 13). As such, this factor favors the Plaintiff.

### 7.   Relationship of the Goods in the Minds of the Consumers [<u>Lapp</u> Factor 9]

The services provided by Plaintiff and Defendants are similar. "The question is whether the consumer might . . . reasonably conclude that one company would offer both of these related products." <u>Sabinsa Corp.</u>, 609 F.3d at 189 (internal citation omitted). Plaintiff's business began in the MMA fight promotion industry in 2009, and in 2012 expanded into the fitness industry. Defendants began in the fitness industry in 2011, and though they try to style themselves as a fitness-focused business, (Pl. Ex. 62), they have also engaged in hosting boxing matches (Pl. Ex. 45, 46, 67), promoting those matches on the internet, <u>id</u>., have sold tickets to at least one MMA event (Pl. Ex. 9), and are affiliated in some way with a few boxers and/or MMA fighters (Pl. Ex. 44, 64, 89). Thus, while the services offered by the two businesses are not identical, they are similar to a very large extent. Defendants' purported emphasis on fitness to the exclusion of fight promotion is insufficient to remove the likelihood that consumers would conflate the services offered by the parties. The Court finds that this factor weighs toward Plaintiff.

### 8.   Other Factors Suggesting the Consuming Public Might Expect the Prior Owner to Manufacture a Product in the Defendants' Market or that He is Likely to Expand into that Market [<u>Lapp</u> Factor 10]

In considering this factor, Courts look at "the nature of the products or the relevant market, the practices of other companies

in the relevant fields, any other circumstances that bear on whether consumers might reasonably expect both products to have the same source." Sabinsa Corp., 609 F.3d at 189 (quoting Kos, 369 F.3d at 724)). Plaintiff argues that, due to failed contract negotiations, Defendants knew that Plaintiff intended to enter the general fitness market prior to their opening ECC Fitness. (Pl. Reply at 8). The Court considers this evidence to be adequately encompassed in the Lapp factor of intent. This factor is neutral.

**9.   Weighing the Factors**

As outlined above, the Court finds that the Lapp factor 2 favors Defendants, while the balance of the factors favor Plaintiff. The two most probative factors, similarity of the marks (Lapp factor 1) and evidence of actual confusion (Lapp factor 6) weigh to some extent in Plaintiff's favor. While there is a factual dispute regarding Defendants' intent in creating their mark, Plaintiff has many factors in his favor even without consideration of this evidence. The Court thus grants summary judgment for Plaintiff on this issue, finding that ECC Fitness's use of its mark is likely to create confusion.

**D.   DEFENDANTS' COUNTERCLAIMS**

ECC Fitness brings a number of counterclaims against XCC, including trademark infringement, False Designation/False Description, Unfair Competition, and Defamation. Though the record contains some evidence of a likelihood of confusion as to the

33

fitness services offered by the parties - misperceptions by two gymgoers, similar channels of trade used, and similarity in the parties' marks - it is insufficient to withstand a motion for summary judgment. Moreover, Defendants present no evidence to support the other elements of their trademark infringement counterclaim. Defendants' remaining counterclaims are similarly unsupported. A party opposing summary judgment "may not rest upon the mere allegations or denials of the . . . pleadings; its response . . . must set forth specific facts showing there is a genuine issue for trial." Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Because Defendants have not met this standard, the Court grants Plaintiff's motion for summary judgment as to all of Defendants' counterclaims.

**CONCLUSION**

To bring a viable claim for trademark infringement under the Lanham Act, the plaintiff must prove three elements: (1) the mark is valid and legally protectable, (2) the plaintiff owns the mark, and (3) the defendant's use of the mark is likely to create confusion concerning the origin of goods or services. E.T. Browne Drug Co., 538 F.3d at 191. For the foregoing reasons, the Court denies summary judgment to Plaintiff on elements (1) and (2), and grants summary judgment on element (3). The Court also grants summary judgment to Plaintiff on Defendants' counterclaims.

An Order follows.